MACK PARAMUS CO., MACK PARAMUS AFFILIATES, MACK DEVELOPMENT COMPANY & MACK PARAMUS PARKWAY CO., PARTNERSHIPS OF THE STATE OF NEW JERSEY, AND MACK DEVELOPMENT CORP. AND PARAMUS OFFICE PARK, INC., CORPORATIONS OF THE STATE OF NEW JERSEY, PLAINTIFFS, v. THE MAYOR AND COUNCIL OF THE BOROUGH OF PARAMUS, DEFENDANTS.

STERNS, INC., A DELAWARE CORPORATION, PLAINTIFF, v. THE MAYOR AND COUNCIL OF THE BOROUGH OF PARAMUS, DEFENDANTS.

RKO WARNER THEATRES VIDEO, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF, v. THE MAYOR AND COUNCIL OF THE BOROUGH OF PARAMUS, DEFENDANTS.

Superior Court of New Jersey
Law Division Bergen County

Decided July 14, 1988.

236

*George B. Gelman* for plaintiffs Mack Paramus Co., Mack Paramus Affiliates, Mack Development Company & Mack Paramus Parkway Co., Mack Development Corp., and Paramus Office Park, Inc. (*Gelman & McNish,* attorneys).

*Robert T. Corcoran* for plaintiff Sterns, Inc. (*Lamb & Corcoran,* attorneys).

*Robert J. Inglima* for plaintiff RKO Warner Theatres Video, Inc.

*Frank J. Cuccio* for defendants Mayor & Council of the Borough of Paramus (*Cuccio & Cuccio,* attorneys).

*Joseph S. Di Maria* for defendants Mayor & Council of the Borough of Paramus.

FOLLENDER, J.S.C.

In this prerogative writs action, Mack Paramus Co., Mack Paramus Affiliates, Mack Development Company and Mack Paramus Parkway Co., partnerships of the State of New Jersey, and Mack Development Corp. and Mack Office Park, Inc., corporations of the State of New Jersey ("Mack"), developers of commercial office buildings, challenge the validity of article 10[1] of the revised ordinances of the Borough of Paramus

---

[1]The preamble of the Paramus Sunday closing ordinance provides as follows:
Article 10: SUNDAY CLOSINGS.

15–40. Declaration of necessity.

The mayor and council hereby finds and declares that:

WHEREAS, the Borough is a suburban community whose primary consideration is the promotion and maintenance of a satisfactory living environment for the present and prospective inhabitants of the borough, and the preservation of the public health, safety and welfare of the municipality and its inhabitants; and

WHEREAS, the borough is traversed by 3 major highways to wit: New Jersey state highway route # 4, New Jersey state highway route # 17 and the Garden State Parkway, all of which are heavily travelled; and

WHEREAS, shopping centers have been established on route # 17 and route # 4 in the Borough; and

(Borough of Paramus Ordinances Nos. 403, 448 and 562) which is a local governmental regulatory scheme commonly known as the sunday closing or blue law.

In *Mack Paramus Co. v. The Mayor and Council of the Borough of Paramus*, 103 *N.J.* 564 (1986), the Supreme Court of New Jersey held that the adoption by the Legislature of *N.J.S.A.* 2C:98–3 (as amended), *L.*1979, *c.* 178, did not preempt, nullify or supercede local Sunday closing regulations and that the municipalities of the State, by virtue of, and pursuant to, the police power vested in them by *N.J.S.A.* 40:48–2 are empowered to adopt more stringent regulations than those enacted by the Legislature with respect to Sunday closings as provided in *L.*1959, *c.* 119 (*N.J.S.A.* 2A:171–5.8 to –5.18).

Presented here for determination are the constitutional issues not dealt with nor decided by the Supreme Court in *Mack Paramus, supra.* Also, the matters involving the complaints

WHEREAS, the Garden State Parkway intersects route # 17 approximately one mile north of route # 4; and

WHEREAS, the traffic peak on the aforesaid thoroughfares in the borough is reached on Sunday with attendant traffic congestion; and

WHEREAS, the operation of highway businesses on Sunday prevents the free flow of traffic, constitutes an ever-present hazard, and renders it difficult and dangerous for motor vehicles to enter and leave said business premises; and

WHEREAS, the conduct of such Sunday businesses by some tends to compel all businesses to remain open every day of the week for long hours, thereby resulting in the physical and moral debasement of the persons directly concerned with their operation and impinging upon the peace and quiet and rest of the residents of the borough; and

WHEREAS, the physical, intellectual and moral good of the community requires a periodic day of rest from labor, and

WHEREAS, as some particular day must be fixed, the one most naturally selected should be that which is regarded by the greatest number of citizens as most appropriate, either by virtue of custom or private religious beliefs;

WHEREAS, the public policy of our state is against all worldly employment on Sundays, except works of charity and necessity;

THEREFORE, the cessation of such activity on Sunday is for the general good and welfare of the community.

filed by Sterns, Inc. ("Sterns"), RKO Warner Theater Videos, Inc. and RKO Video Radio Shack, Inc. ("RKO") against the mayor and council of the Borough of Paramus, although not consolidated, were tried simultaneously for purposes of judicial economy.

Plaintiffs contend that the Paramus Sunday closing ordinance is unconstitutional, both facially and as applied, because it represents an unreasonable exercise of the police power and is discriminatory, resulting in a denial of equal protection and due process of law.

Additionally, plaintiff-Mack seeks a judgment declaring that the operation and maintenance of computers in commercial office buildings is a work of necessity and consequently exempt from the prohibition of the ordinance. Likewise, plaintiff-Sterns contends that, as a matter of necessity, it be permitted to provide two persons in three eight-hour shifts on Sundays to monitor and maintain its computers which are housed in its computer facility located on Route # 17. Finally, RKO asserts that it is engaged in a recreational activity, and thus, exempt from the ban of the ordinance.

Defendant, Borough of Paramus, responding to the claims of unconstitutionality presented by plaintiffs argues that those issues were finally determined in favor of defendant by the Supreme Court of New Jersey in *Masters–Jersey, Inc. v. Paramus*, 32 *N.J.* 296 (1960), and that nothing has occurred since then to alter, change or modify that decision.

Paramus also asserts that computer operations, in themselves, do not constitute a work of necessity entitling Mack's tenants or Sterns to an exemption from the ordinance; that RKO is involved in a retail business activity of selling or renting movie video tape cassettes, which has only an incidental relationship, at best, to recreation, and therefore, it does not qualify for an exemption from the ban of the ordinance.

The history of Sunday closing legislation in New Jersey generally, and in Paramus more specifically, has been fully

explicated in *Mack Paramus*, supra, 103 *N.J.* at 568–573 and needs no restatement here.

In 1957, when the initial Paramus closing ordinance was enacted, the borough was in a relatively bucolic state. Fred Galda, then Mayor of Paramus, testified at trial that Paramus was a rural-suburban community approximately 50% undeveloped and contained wide expanses of vacant land. At that time only two major arterial highways, State Highways # 4 and # 17 traversed the borough and to which were attracted certain retail businesses including a few of the discount store variety. However, looming large on the horizon was the immediate pending completion of two substantial shopping centers located on Route 4 East known as Bergen Mall and Garden State Plaza. The potential impact of these two concentrated business enterprises upon traffic conditions and the residents of the borough aroused great concern among the governing body and served as a driving force behind the enactment of the ordinance. Mayor Galda noted that, in 1957, there was little commercial office building development in the borough and that which did exist was insignificant.

Routes # 4 and # 17 served as principal east-west and north-south corridors, respectively, and were heavily burdened with traffic by those utilizing the George Washington Bridge and others seeking connection with central Bergen County, Passaic County, New York State and points beyond.

Fearing that the shopping centers would, as a by-product, bring to the community excessive traffic demands and a relentless, unyielding seven-day-a-week business-work requirement, the framers of the original Sunday closing ordinance sought to strike at the twin evils, perceived to exist, in order to:

1. achieve a reduction of traffic both on the highways with the attendant ripple effect on interior borough roadways caused by the intensive highway use; and

2. afford the residents of Paramus a day of rest and relaxation from the every day hustle and bustle in order to preserve

and uplift the public health, safety and welfare of the borough and its inhabitants.

The drafters of the original ordinance noted that at that time "the public policy of our State is against all worldly employment on Sundays, except works of charity and necessity." *See N.J.S.A.* 2A:171–1 *et seq.; Auto Rite Supply Company v. Woodridge Township*, 25 *N.J.* 188 (1957).

Against the backdrop depicting the Paramus of 1957, we now move to the Paramus of 1988. Vast changes in the demographic make-up of the community and land use have taken place. At the present time, Paramus is intersected, not only by Routes # 4 and # 17, but also by the Garden State Parkway, which in turn, intersects State Highway # 80, and which in turn, is a feeder for the Palisades Interstate Parkway. The arterial highway system serves and impacts upon areas inside and outside of Paramus both immediate and distant and, of course, upon the population that resides and works therein. The use of highway frontage along Routes # 4 and # 17 in Paramus has markedly intensified. There now exists at least seven concentrated shopping areas which may properly be termed as centers or malls. Substantial portions of property along the highways and roadways immediately adjacent to the Garden State Parkway are dedicated for commercial office building use by the zoning ordinance, resulting in the construction of a significant number of high-quality commercial office buildings. The balance of the highway frontage is now almost completely covered by retail-shop enterprises of an almost limitless variety. The most significant consequence of the highway business activity is continual traffic congestion with little or no let-up, except in the late-evening or early-morning hours. The remainder of the land in Paramus is devoted exclusively to residential housing of a one- or two-family type. There are no multiple-family housing developments. Paramus is strategically located in central Bergen County and occupies the largest land mass of the 70 municipalities in the county, and yet, it serves as home to only

26,000 residents out of a county-wide population of approximately 900,000.

The ordinance proclaims "No worldly employment or business, except works of necessity and charity, shall be performed or practiced by any person within the borough on Sunday." Paramus, N.J., Rev.Ordinances, §§ 15–14; Paramus, N.J., Ordinances, § 1. That statement of intention was included in the original 1957 ordinance and has been restated in every amendatory ordinance on this subject to the present time. Despite that base-line concept, by virtue of other provisions contained in the original and amendatory ordinances and stated exemptions, a great deal of activity is permitted in Paramus on Sunday, so long as, the activity does not involve worldly employment not otherwise exempt.

Under the general heading of necessity, persons on Sunday may engage in: the operation of a hospital and related activities; the sale of drugs and related items; the sale of food; the passage of all types of motor vehicles, including trucks, on highways and interior roads; the operation of computers at police headquarters; the servicing and repair of public utilities including cable television.

Under the rubric of sports and amusements, the following activities are allowed on Sunday: the operation of movie theaters, pool halls, roller rinks, concert arenas, swimming pools, camps, bowling alleys, video arcades, health clubs, state playhouses, carnivals, zoo rides, other amusements and devises for which municipal licenses are required pursuant to the revised ordinances of Paramus, ch. 4, Arts. 1–4, §§ 4–1 to 4–48.

There are also numerous exemptions from the ban of the ordinance which allow the preparation and sale of drugs, meals and prepared foods, non-alcoholic and alcoholic beverages, perishable agricultural and horticultural products, the printing, publishing and sale of newspapers, magazines and periodicals, the delivery of milk, bread and baked goods, and a person may walk, ride or drive for recreation, rent conveyances for riding

and driving, sell gasoline and other petroleum products for motor vehicles, engage in any form of recreation, sport or amusement not otherwise unlawful, so long as other persons are not disturbed in their observance of Sunday, and sell and dispense directly or by vending machine, cigarettes and other tobacco products and exhibit or sell or lease residential real estate.

Chief of Police Joseph Delaney testified that in addition to all of the activities listed hereinabove, residents of Paramus may, on Sunday, perform any and all chores required for the care and maintenance and repair of their residences, so long as no person is employed to do the work. He further opined that a resident was free to pursue any lawful task within the privacy of his own home, including office work, because such work is not considered to be worldly employment, and consequently, is outside the scope of the ordinance.

All other work-related activities cease on Sunday, with particular emphasis on shopping centers, commercial office buildings, warehouses and retail sales establishments.

Mayor Joseph Cipolla and Chief Delaney concurred in the opinion that there is substantially less traffic on Sundays than on weekdays in the community because of the blue law, even though Paramus offers no resistance to traffic on the highways. From all of the foregoing, it is clear that presently Paramus is hardly an island of tranquility in a torrential sea, but the hectic conditions which exist on weekdays in the borough are lessened on Sunday directly as a result of enforcement of the Sunday closing ordinance, while at the same time, community residents, though active, are diverted from their daily workday routines.

Counsel for plaintiffs correctly assert that the public policy of the State enunciated in the 1951 revision of *N.J.S.A.* 2A:171-1 *et seq.,* provided in pertinent part as follows:

No worldly employment of business, except works of necessity and charity, shall be performed or practiced by any person within this state on the Christian

Sabbath, or first day of the week, commonly called and hereinafter designated as Sunday.

This language was included in the original Paramus closing law ordinance and carried forward even until today, Paramus, N.J., Rev.Ordinances, §§ 15–41, but was repealed by the State Legislature in the 1959 revision of the Sunday closing law, *L.*1959, *c.* 119, *N.J.S.A.* 2A:171–5.1 *et seq.; Two Guys From Harrison v. Furman*, 32 *N.J.* 199 (1960). The *c.* 119 legislation serves only to prohibit the sale of five categories of goods enumerated therein and gives the voting public, residing in each county in the State, the option to determine by referendum whether the statute should apply. Thus, it is clear that the State policy in effect when the original Paramus closing ordinance was adopted has now been abandoned. However, *Mack Paramus, supra,* teaches that the source of municipal authority to enact restrictive Sunday legislation lies in the police power embodied in *N.J.S.A.* 40:48–2 and that municipalities may enact more stringent regulations than ordained by the State Legislature, provided municipal ordinances do not permit the performance of an act which is prohibited by State law.

Plaintiffs attack the validity of the ordinance on various grounds which are dealt with hereinafter *seriatum.*

Initially, plaintiff-Mack contends that the forced closing of its commercial office buildings on Sunday due to enforcement of the ordinance constitutes an unreasonable exercise of police power and a denial of due process of law.

██ Mack rests this constitutional attack primarily on the testimony of its expert, Peter Abeles, an expert in urban planning, who testified that, by means of extrapolation utilizing office buildings open on Sunday located in nearby Bergen County communities as his comparables, he was able to ascertain, with reasonable certainty, the extra traffic which would be generated in Paramus if commercial office buildings were permitted to open for their customary businesses on Sundays. Abeles stated that 283 cars could, under normal conditions, be

expected to be added to the traffic load in the borough for all office buildings located therein and that such a minimal addition to the traffic flow would be insignificant and would have no adverse impact upon Paramus. Assuming, *arguendo*, that the hypothesis advanced by Abeles is true, it fails to support Mack's position as a matter of law. The governing body of a municipality, when exercising its legitimate legislative function, is not required, in order to act lawfully and constitutionally, to measure with preciseness the degree or percentage which a particular activity may contribute to the adverse condition sought to be corrected. The evil targeted by the ordinance for treatment was excessive traffic upon the highways generated by workaday business activities and one of the goals which the Sunday closing ordinance sought to achieve was the elimination of that evil. Commercial office buildings admittedly generate more traffic, no matter how slight, and therefore, the inclusion of commercial office buildings as a prohibited Sunday activity cannot be deemed unreasonable, and hence, not a denial of due process of law.

█ Secondly, the scope of the ordinance is not overbroad so as to create a constitutional infirmity as argued by plaintiff-Mack. The ultimate objectives of the ordinance were to reduce traffic and to provide a climate so that Sunday would be a common day of rest and relaxation. The twin goals sought to be achieved afford substantial benefits to the general populace and as noted in *Two Guys From Harrison, Inc. v. Furman*, 32 *N.J.* 199 (1960), are properly within the legislative contemplation in prohibiting Sunday activity. *Vornado, Inc. v. Hyland*, 77 *N.J.* 347, 355 (1978).

Thirdly, plaintiff-Mack asserts that the municipal legislative scheme impermissibly impacts on interstate commerce in violation of the Commerce Clause of the United States Constitution. I do not agree.

█ The basic issue here presented is whether the prohibition of the ordinance against computer usage on Sunday imper-

missibly casts an intolerable burden upon interstate commerce. It cannot be denied that it is common for computers to be used as business tools across state and even international boundaries. But the mere fact that a restriction, by ordinance, imposes some burden upon industry and commerce is not sufficient, in and of itself, to require an adjudication of invalidity of the legislation, for it must impermissibly or unfairly burden interstate commerce to be deemed constitutionally deficient. In the exercise of its police power, a municipality may enact an ordinance which does "restrict personal freedom and property rights and sometimes imposes burdens upon or affects interstate commerce. In the latter connection where the burden is incidental and the restriction warranted by local needs, it is generally held that such local legislation is valid." *Cunard S.S. Co. v. Lucci*, 92 *N.J.Super.* 148, 155 (Ch.Div.1966), aff'd 94 *N.J.Super.* 440 (App.Div.1967); *Pike v. Bruce Church, Inc.*, 397 *U.S.* 137, 90 *S.Ct.* 844, 25 *L.Ed.*2d 174 (1970). Moreover, the proofs presented fail to sustain a finding that, as a broad and general concept, computer usage on Sunday does in actuality constitute a burden on interstate commerce. As a matter of fact, the evidence compels an opposite conclusion. The witnesses who testified at trial on the subject of computer usage unanimously agreed that the computers, whether they be micro, mini or main frame are capable of receiving and storing information despite the restriction of the ordinance. In short, computers can and do operate, albeit in a limited form, on Sunday. Even if it is agreed that certain additional functions could, and would, be carried out through use of the computers on Sunday if unlimited access were permitted, the burden imposed by the ordinance falls well within the area of an incidental limitation, which is well warranted by the needs of the local community, and thus, the ordinance does not run afoul of the Commerce Clause of the United States Constitution, Art. I, sec. 8, cl. 3.

Next, plaintiff-Mack argues that the ordinance violates its First Amendment rights involving commercial speech because

the ordinance unduly restricts the ability of computers on Sunday. Again, I must dissent.

At the outset, it is noted that plaintiff-Mack does not contend that it is a computer user or operator, and therefore, its standing to challenge the ordinance on the ground that the ordinance constitutes an impermissible imposition on commercial speech is highly questionable. Assuming, *arguendo*, that Mack does have standing to attack the ordinance on this ground, it must be stated that research fails to reveal a single case, nor has one been cited to the court by counsel which holds that "computer speech" is commercial speech. Commercial speech generally involves some form of advertising or communication, such as signs or billboards, which not only serves the economic interest of the speaker, but also serves and assists the public interest. In *Central Hudson Gas & Electric Corp. v. The Public Service Commission of New York*, 447 *U.S.* 557, 100 *S.Ct.* 2343, 65 *L.Ed.*2d 341 (1980), the Supreme Court stated: "Commercial expression not only serves the economic interest of the speakers, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Id.* at 561–62, 100 *S.Ct.* at 2349. It is further observed that the ordinance does not limit the ability of computers to receive and store information, although the full scale of computer operations and maintenance are somewhat curtailed on Sundays. However, since computers do contribute to the dissemination of information of vital importance to the consuming public, their "speaking" may well be classified as commercial speech, and thus, be entitled to protection as such, and hence, it is necessary to determine the question as raised by plaintiff-Mack.

In *Central Hudson Gas & Electric Corp., supra,* the Supreme Court set forth a four-prong test to determine whether commercial speech was constitutionally protected by the First Amendment: (1) was the activity for which protection is sought lawful and not misleading; (2) is the asserted governmental interest substantial. If the foregoing yield positive answers it

next must be determined: (3) whether the regulation directly advances the governmental interest asserted; and (4) whether it is not more restrictive than is necessary to serve that interest.

The activity for which the protection is sought by plaintiff-Mack is for all computer speech, the use of which may be lawful and not misleading when tested in an actual setting. The court is unwilling and unable to make a blanket finding to that effect, especially where, as here, the record is barren of evidence to support such an overall conclusion. It is apparent that the first prong of the test as noted in *Central Hudson Gas, supra,* requires scrutiny of a specific and actual factual complex on a case by case basis in order to reach a sound and final determination. Since plaintiff seeks protection for all computer operation generally, rather than computer operation usage in a specific setting, it has failed to set forth a justiciable claim, and thus, has failed to sustain its burden with respect to the first prong of the test set forth in *Central Hudson Gas, supra.* In view of the court's finding, it is patently unnecessary to measure the remaining three prongs of the *Central Hudson Gas* test against the evidence. However, to the end that there be no misunderstanding, the court finds from the evidence that the interest of Paramus in reducing traffic and providing a day of rest and relaxation for its residents is a matter of prime governmental importance and that the ordinance limitations are not more extensive than is necessary to serve the governmental interest here asserted. Hence, the ordinance passes constitutional muster, even if general computer operations are deemed to be a lawful and not misleading activity. Plaintiff-Mack's reliance upon the recent decision of the Supreme Court of New Jersey in *Bell v. Stafford Tp.,* 110 *N.J.* 384 (1988) is misplaced. In *Bell,* it was determined that the sweep of the challenged ordinance was so great that it impermissibly impacted upon non-commercial speech and therefore the burden of overcoming the charge of constitutional

invalidity was particularly strenuous. Since, concededly, non-commercial speech is not here implicated, *Bell* is inapposite.

Next, all plaintiffs charge that the ordinance is vague, uncertain, and lacks standards in order to assure uniform treatment to all persons subject to its mandate. Plaintiffs argue that the enforcement history of the ordinance demonstrates that certain business enterprises such as Becton Dickinson and United Parcel Service (UPS) were authorized to operate their computers on Sunday, whereas Sterns and other applicants were denied that right and such uneven treatment evidences an inability on the part of those charged with enforcement of the ordinance to apply the ordinance even-handedly. But the evidence produced at trial fails to support plaintiff's position. The ordinance itself contains words with well-recognized and easily understood meanings and is not vague or uncertain and the standards necessary for application of the ordinance are fairly set forth within its framework. The fact that numerous applications for relief from the ordinance were referred from time to time to the council to render its collective opinion as to whether the activity sought to be conducted on Sunday was permissible under the terms of the ordinance does not lend itself to the conclusion that an errant decision on the part of the council in granting or denying permission should render the ordinance void on the ground of arbitrariness. In his capacity as chief law enforcement officer, Chief Delaney testified that he was "very comfortable" with the language of the ordinance and that he experienced "no difficulty" in carrying out his duties of enforcement and that as far as he was concerned the ordinance was very clear and unambiguous. The fact is that the evidence produced by plaintiff from the records of the Borough of Paramus, regarding applications for relief from the ordinance, fail to show a pattern of arbitrariness contended for by plaintiffs. *Vornado, Inc. v. Hyland, supra; State v. Monteleone* 36 *N.J.* 93 (1961); *State v. K–Mart*, 141 *N.J.Super.* 546 (App.Div.1976). Therefore, the attack of plaintiffs on this ground fails.

Finally, plaintiffs allege that the ordinance invidiously discriminates against them because the classifications set forth therein regulating their activities lack a rational basis, and therefore, the ordinance is unconstitutional. This claim was advanced and rejected in *Masters–Jersey, Inc. v. Paramus, supra.* Plaintiffs argue that the record developed in *Masters–Jersey, supra,* was not complete and that the evidence presented in the course of this trial some 28 years later demonstrates that the classifications contained in the ordinance are irrational requiring the court to reach a different result.

The equal protection analysis here projected is well settled. It is the duty of plaintiffs who challenge the validity of the ordinance to bear the burden of affirmatively demonstrating that in the actual state of facts that surround their operations, the classifications lack rationality.

On the other hand, the court must determine whether there exists any conceivable basis to justify the scheme of classification. In *Two Guys, supra,* Chief Justice Weintraub stated:

As stated in [*New Jersey Restaurant Ass'n v.*] *Holderman* [24 *N.J.* 295 (1957)], a discrimination which in the nature of the subject matter would otherwise be invidious may be relieved of that character if, generally speaking, a rational basis may be found for it in terms of degrees of evil or in the practical problems inherent in the process of legislating or in enforcement. The reason why a Legislature may strike at an evil where it finds it without first surveying the entire scene in which it may exist even in equal degree is an inescapable concession to the practicalities of a complex social and economic order. The legislative process would be hamstrung if the Legislature had to explore every nook and corner before it acted. [32 *N.J.* at 219]

The overwhelming evidence is that Paramus has been transformed from the rural-suburban borough of 30 years ago with large expanses of open spaces having a potential for substantial retail and commercial business usage into a modern day Goliath of the business world. The once vacant land is now virtually non-existent and the potential for development of the highway frontage is now almost completely realized. Retail shopping centers and stores abound, millions of square feet of medium-rise office buildings are now in place, as well as large

numbers of commercial warehouses. Even the residential aspects of Paramus have little room for further expansion. Taking all of the foregoing evidence in toto, one can scarcely avoid the undeniable fact that Paramus has been caught in the vise of an ever advancing society with an apparently unlimited appetite for more-more traffic, more business. It is no wonder, then, that the twin objects of the Paramus Sunday closing ordinance are the reduction of traffic caused by work related activities and the hustle and bustle associated with the daily grind. In the circumstances, the classifications spelled out in the ordinance cannot be said by the judicial mind to unlawfully discriminate against those persons whose activities are prohibited because it is clear from the evidence, and I find as a fact, that as a result of the enforcement of the ordinance, there is a considerable lessening of traffic in all sections of the community and substantial relief enjoyed by the residents of Paramus from the workaday world, while at the same time, through use of the exempted classifications specifically set forth in the ordinance, the needs of the people are met and benefits and pleasures are conferred upon the community at large. As stated by our Supreme Court in *Vornado v. Hyland, supra:*

> It is the legislative function, not that of the court, to weigh the anticipated benefits to the public against the detriments to would-be Sunday shoppers and merchants. Only if the anticipated benefits could be affirmatively established to be so illusory as to stamp the legislative classifications as arbitrary or capricious would a court be justified in striking it as lacking in equal protection or as denying due process. [77 *N.J.* at 356]

Of course, there may be situations in marginal areas where vendable items or activities are prohibited causing those who are offended thereby to cry discrimination. However fundamental constitutional law in this area teaches that through use of an elastic interpretive process the ordinance will be expanded to avoid a fatal defect. This doctrine was followed by our Supreme Court in *Masters–Jersey, Inc., supra,* wherein the Court stated as follows:

> The legislative body spelled out what it affirmatively found to be necessities to foreclose any dispute about it, and if that specification would lead to constitu-

tional infirmity unless indistinguishable items are also vendable, the word "necessity" will be construed to include them. [32 *N.J.* at 301]

■ Plaintiffs also contend that the classifications contained in the ordinance discriminate against members of the same class. For example, RKO argues that the sale or rental of a video cassette movie tape is indistinguishable from the purchase by a patron of a movie theater ticket or other recreational event. Sterns contends that, having given its imprimatur to Becton–Dickinson and UPS for Sunday computer operations, it is discriminatory for Paramus to foreclose it from monitoring and maintaining its computers on Sunday. Mack urges that the studies done by its expert, Peter Abeles, amply demonstrate that, while residents of Paramus perform personal and office tasks in their residences on Sunday without ordinance restraint, the performance of the very same tasks by the people in plaintiff's office buildings are prohibited. However, mere inequities do not lead to a decree of unconstitutionality. As has been stated heretofore, the proper procedure to preserve the ordinance is simply to expand its interpretation, where required, to cure the defect.

With respect to the contentions advanced by RKO and Sterns in this context, a finding, by the proper municipal officials of the Borough of Paramus, that the operation sought to be conducted on Sunday by each of them is neither a "necessity" nor otherwise exempted does not lead to a conclusion of discrimination, even if that finding be so wide of the mark that it has no factual basis, because such a decision is always subject to review by a tribunal duly empowered to hear and decide an appeal by those seeking relief. Also, the interpretation, that work in the privacy of the home does not constitute "worldly employment," is consistent with the policy of the ordinance and the conduct prohibited thereby. Thus, there is no invidious discrimination, here, denying plaintiffs equal protection of the law.

Accordingly, the constitutional challenges by plaintiffs, Mack, Sterns and RKO attacking the validity of the Paramus Sunday closing ordinance are rejected.

Apart from the constitutional challenges, plaintiff Mack seeks a judgment declaring that computer operations and maintenance should be exempt from the prohibition of the Sunday closing ordinance on the ground of necessity. At trial, Ralph Henig, vice president and head of marketing, leasing and zoning for plaintiff Mack testified that his primary responsibility was the development of commercial office buildings in Paramus, although he is now presently stationed in Arizona; that Mack has constructed commercial office building complexes throughout New Jersey and in other states where it is not faced with any Sunday closing restrictions except in Paramus. In Paramus, Mack has constructed or is constructing six high quality commercial office building projects for a total square footage of 1,342,000 square feet. All of the buildings have been built without specific tenants under lease. Mack began developing office buildings in Paramus in 1973 and 1974 and selected Paramus principally because of its outstanding location astride or near State Highways # 4 and # 17, the Garden State Parkway and Interstate Highway # 80. Paramus encouraged the construction of office buildings because of the type of ratables they produce, but the borough, in approving building projects, was always sensitive to traffic patterns and before granting approval made provision for lessening the effect of traffic caused by the commercial office buildings on interior roads. There is a vacancy rate of 29% in the office buildings and the Sunday closing law is a substantial factor in causing this problem due to the fact that many companies have bypassed Paramus because of the restrictions imposed on the use of computers on Sundays.

Michael P. Miller, a senior vice president in charge of real estate of Toys–R–Us (TRU) testified that as of February 1, 1988 there existed 313 company-owned, domestic TRU retail outlets from coast to coast, 37 stores overseas; 74 Kids–R–Us

(which sell childrens' clothing) and four department stores. The entire operation of all the stores are linked together by computers located in the company headquarters at 395 West Passaic Street, Rochelle Park, consisting of 93,000 square feet of space. The company wanted to move all of its headquarters personnel to one place in Mack Center IV, consisting of 250,000 square feet of space but did not do so because TRU could not be assured of operating its computers on a seven-day-a-week, 24–hour–a–day configuration due to restrictions set forth in the Paramus Sunday closing law. It did, however, lease 50,000 square feet of space in Mack Center IV. There are between 10 and 15 people present on Sundays in the Rochelle Park facility to handle the computers for the usual business, however, from Thanksgiving to Christmas when the retail stores are open to midnight, 30 to 40 people are present to operate the computers on a seven-day-a-week, 24–hour basis. TRU has negotiated a lease in Mack Center IV for 150,000 to 160,000 square feet of space which is now almost ready for occupancy, but would not bring its computer facility or back-room accounting operations to the building because of the ordinance restrictions.

Miller also stated that the business of TRU could not realistically be controlled without constant access to its computers because the company's business would be disrupted. In the far-flung operations of a corporation such as TRU, operating as it does in different time zones both domestically and internationally, a computer operation of seven days a week on a 24–hour–a–day configuration is essential. Without it the company could not function.

Victor Goldberg, an accountant in computer operations for the accounting firm of Peat, Marwick & Mitchell, testified that today the majority of public corporations utilize computers for a variety of tasks. There is a need for continuous operations in such businesses as airlines, banking, manufacturing, processing, accounting, brokering, just to name a few. While full staffing is not necessary on weekends, a skeletal crew is

required because there are functions and maintenance which must be performed on Sunday.

Plaintiff Mack also called Myron Uretsky, a professor of management systems in the New York center of the Rutgers University school of business, who qualified as a computer expert specializing in the technological impact on computers in industry. Uretsky opined that, as the use of computers spreads to all levels of business operations, the use on a continuous basis has become more critical. Constant maintenance of on-line main frame computers is mandatory because a shut-down would cause an irretrievable loss of information resulting in irreparable harm to the business organization involved. Companies, dependant upon the continuous use of computers:

1. are open on Sunday;
2. employ skeletal staffing;
3. conduct on-line transaction processing;
4. conduct system testing in maintenance only; and
5. use Sunday to catch up on backlogs.

Uretsky concluded that the bottom line is that businesses are more dependent than ever on computers today and that dependency will increase markedly in the future; computers are a critical corporative force and represent a great savings in business operations; and a computer is the lifeblood of a company that utilizes one, but computers can fail and a failure is a result that can be very serious and harmful to a business operation.

The evidence produced by Mack in the prosecution of this charge was fully supported and corroborated by the testimony of those witnesses who testified in the case of *Sterns v. Paramus, infra.*

A brief review of the action taken by Paramus with respect to business computer operations on Sunday is in order. Since 1973, United Parcel Service has been allowed to have two employees work in their computer center on Sundays, ostensibly for the undocumented reasons that UPS is engaged in some type of "Government work." In 1981, Becton Dickinson, a

large pharmaceutical firm, was granted permission to service their computers on Sundays on the theory that the company operated a nationwide computer system that services dialysis machines and also routes emergency blood, although, there is no evidence that Becton Dickinson's allowed computer service operations are limited to the scope of that work. Numerous requests to perform emergency maintenance or computer installations on Sunday have been granted to companies such as Grand Union, Sharp Electronics, Numerox and Paychex Corp., while other requests to operate computers on Sunday by business organizations have been denied. As a result, the ordinance enforcement policy of Paramus *vis-a-vis* computer operations by business organizations is acknowledged to be clouded and undistinctive. However weak, lax or inconsistent, law enforcement cannot serve as a basis to render the ordinance invalid and that argument is foreclosed as a matter of law. *Vornado, Inc. v. Hyland*, 77 *N.J.* 347 (1978); *State v. Monteleone*, 36 *N.J.* 93 (1961); *State v. K–Mart*, 141 *N.J.Super.* 546 (App.Div.1976).

Hence, it is necessary to determine, in the light of this record and past history, whether computer operations constitute a work of necessity.

The word "necessity" has a generally well-accepted and understood meaning which is neither vague nor inactive, but it is a word susceptible of various meanings. It may import that which is only convenient, useful or appropriate to the ends sought, or it may mean something which, in the accomplishment of a certain object or goal, cannot be dispensed with, or it may mean something reasonably useful and proper in relation to the particular object to be achieved. It is all a matter of degree. Conceptually, necessity must also be an elastic term capable of expansion when required in order to keep pace with the ever-changing demands, purposes and goals of our constantly evolving society. There is no doubt that what may not have been a necessity 30 years ago is considered an absolute necessity today. Technological advancements upon which the

modern world depends have contributed mightily to this process and no other invention or scientific achievement in the 20th Century can rival that of the computer in that regard.

Certain business operations have been held by other courts to constitute works of necessity. In *State v. McBee,* 52 *W.Va.* 257, 43 *S.E.* 121 (Sup.Ct.1903) the court held that whether the continuous operation of an oil well was a necessity was a question for the jury. In *Turner v. State,* 85 *Ark.* 188, 107 *S.W.* 388 (1907) the court held that it was necessary to clean boilers used for steam production on Sunday so that they could operate on the other six days of the week. In *Natural Gas Products Co. v. Thurman,* 205 *Ky.* 100, 265 *S.W.* 475 (Ct.App. 1924), the court held that interrupting the continuous production of carbon black would result in a severe hardship upon, and loss to, plaintiff. The court held in *Mullis v. Celanese Corp.* 234 *S.C.* 380, 108 *S.E.*2d 547 (1959), that a mill engaged in the production of cellulose acetate flake and cellulose acetate yards and fibers could operate continuously 24 hours a day, seven days a week.

In *McAfee v. Commonwealth,* 173 *Ky.* 83, 190 *S.W.* 671, 673 (Ct.App.1917) the court defined necessity as follows:

> The fact that the failure to do something may cause interruption or delay in the ordinary course of business, or some discomfort or inconvenience to the individual affected or the public, will not make the doing of the thing a work of necessity. It must be something that not to do would work severe hardship or loss or unusual discomfort or inconvenience either to the individual who does the thing complained of or to the person or persons for whom he does it. [190 *S.W.* at 673]

The thread common to all of the above cited cases is the continuous nature of the business enterprises involved.

In the world of the present, the computer is a sophisticated business and scientific tool used for endless varieties of applications in both the public and private sector. And, its use is universal. It is common knowledge that the computer today is the core equipment necessary for the successful operation of any system, organization, institution or industrial combination, including the very smallest of such entities. The very existence

of our society, as we know it, relies heavily upon smooth operations of computers and our dependence upon the advances associated with that technology grows with each passing day. There can no longer be any doubt that in many circumstances the continuous operation of computers on a seven-day-a-week, 24–hour–a–day configuration is a primal need for the public and for the user.

The unrefuted evidence in this case is that main frame computers occupy a special and unique position even in relation to other types of computers of lesser stature. That is so because main frame computers, unlike other smaller and less complex machines, require continuous monitoring and maintenance to prevent irreparable damage to the equipment and permanent loss of irretrievable information. Although the court recognizes that ordinarily a determination of necessity can be made only after a factual search on a case-by-case basis with respect to main frame computers, reasonable minds cannot differ in finding that this type of computer usage requires continuous, uninterrupted monitoring and maintenance which compels its designation as a work of necessity.

Therefore, I hold as a matter of law that main frame computer operations may be monitored and maintained on Sunday pursuant to the Sunday closing ordinance as a work of necessity, subject to reasonable regulation by Paramus with respect to staffing.

Computer operations and the operation of lesser types of computers known as micro or mini may, under the proper circumstances qualify as a work of necessity within the framework of the ordinance following a complete evidential review. Important factors for consideration in each case are: the nature of the business conducted by the applicant; whether continuous use of a computer is required in the regular course of the business operations of the user; the interest that the public has in the business of the user; the degree of dependency by the user on a computer; whether computer operations on Sunday

are likely to cause substantial detriment to the general public good and welfare.

Utilization of the above stated criteria in each case will provide the basis for an even-handed, consistent application and enforcement of the ordinance in this area.

To the extent stated herein, judgment is hereby entered in favor of the plaintiff Mack and against defendant borough on the first count of the complaint.

### STERNS v. PARAMUS.

Sterns, a major full-line department store business, operates 28 stores located in New York, New Jersey and Pennsylvania. Of the 28 stores, 27 are in full operation, seven days a week, including Sunday. Only that store located in the Bergen Mall shopping center on Route #4 East is closed on Sunday because of the Paramus Sunday closing law. Sterns opened its Paramus store in 1957 and admittedly was aware of the Sunday closing ordinance then in effect. Sometime thereafter, Sterns established, at a separate location on Route #17, its central computer facility which services the entire 28–store operation. In the computer facility are housed micro, mini and main frame computers.

Sterns requested permission from borough officials to allow two of its employees to work in three, eight-hour shifts in the computer facility on Sunday for the purpose of monitoring, maintaining and attending to malfunctions of the computers on an emergency basis, on the grounds that such work constitutes a "necessity," and thus, is exempt from the ban of the ordinance. Paramus responded by rejecting a request of Sterns, however, Sterns refused to accept the rejection and decided to allow a skeletal crew to work in the computer facility on Sunday in order to test the enforceability of the ordinance. As a consequence, summonses were issued by the Paramus police on two occasions, charging Sterns with violations of the Sunday closing ordinance. Sterns then instituted this action seeking a

determination from the court as to whether its perceived need to employ a skeletal work force on Sunday to service its computers is a work of necessity which exempts it from the prohibition of the Paramus blue law.

Lawrence Stone, chairman and chief executive officer of Sterns testified that, although 27 of the 28 department stores operated by Sterns in the Tri–State area which it serviced are open seven days a week for retail business, he had no desire to open the Paramus department store on Sunday, but would do so if forced by competition. Stone noted that shopping habits have changed markedly over the years and weekend shopping has grown dramatically and continues to grow. He stated that in today's public climate, operation of Sterns' computers was essential for all of the activities conducted in its stores. Stone emphasized that the computers located in the computer facility control and monitor credit authorizations and every retail transaction and have total control over inventories, price changes and the merchandise reporting system. Every piece of information necessary to carry on the business of Sterns emanates from the computer facility where there are employed 350 persons of which 65 work exclusively with the computers on a 24–hour basis in three eight-hour shifts. Stone said that a shutdown of the computers would literally cause a shutdown of all of the stores that are open and operating because they cannot function without the computers since no credit request could be authorized. Stone's testimony was supported by that of Vincent Mignone, vice president and controller of Sterns, and the person responsible for handling all financial transactions and the electronic data processing needs, as well as Ernest Deners, assistant manager of management systems. They testified that, in the event of a malfunction of the main frame computer for any one of an endless variety of reasons or a power failure, irreparable damage could and would be caused to the computer equipment and the records of Sterns irretrievably lost.

Peter Malvasi, a computer expert employed by Paramus, stated, in a certification filed in opposition to Sterns' order to show cause, as follows:

> Therefore, while a mainframe operation may require necessary personal attention at all times for technical reasons, that should be the extent of the absolute necessary [*sic*] of the after-hour/weekend activity.
>
> The rough analogy may be to compare the necessary [*sic*] of a bank or store to maintain a staff of guards in a facility at all times while not particularly carrying on the specific business or operations of the company.

Thus, Malvasi, at least as main frame computers are concerned, accorded with the views expressed by Sterns' personnel that monitoring and maintaining that equipment on a continuous basis is a necessary and essential activity to prevent damage and loss.

Police Chief Joseph Delaney testified that complaints of Sunday operations by Sterns in its computer facility were reported and summonses were issued as a response. Chief Delaney stated that the mayor and council never sought his opinion before rejecting Stern's request to permit a Sunday skeletal crew to work in the computer facility although he was of the opinion that two employees working three eight-hour shifts would have absolutely no adverse impact on the borough, its residents or on traffic conditions. When asked whether, in his judgment, the work sought to be conducted by Sterns on Sunday fell within the exemption of a work of necessity Chief Delaney said it did not because, in his judgment, the word "necessity" took into account only the activity conducted by the actor and its impact upon the public, while the need of the actor was, in his opinion, irrelevant.

 Relying upon the criteria previously established by this court, I find from the evidence produced during the course of this trial that the need of Sterns to provide a two-employee crew on three, eight-hour shifts on Sunday for the purposes of servicing its main frame computers and to handle emergencies is both essential and necessary for the conduct of its business organization. To that end, the public welfare is likewise en-

hanced because trouble-free computer operations mean better and more efficient services to the public when the retail operations are open for business. There is no evidence that allowing Sterns to service its main frame computers on Sunday in a limited fashion will adversely impact on traffic conditions or the desire of residents of Paramus to enjoy a day of rest and relaxation.

Judgment is therefore rendered in favor of plaintiff and against defendant on the first count of the complaint.

## *RKO v. PARAMUS.*

RKO contends that it is in the business of selling or renting video cassette movie tapes, which business activity should be classified as recreation or amusement, thus exempting it from the prohibition of the Sunday closing law. Paramus opposes that view and has rejected RKO's demand that it be permitted to conduct its business on Sunday.

RKO maintains two locations in Paramus:
(1) at 308 East Route # 4; and
(2) in the RKO tenplex complex on Route # 4 East.

It is unrelated to RKO Theaters which operate the movie complex.

Plaintiff is in the business of selling and renting video cassette movie tapes.

Plaintiff made an application to the Borough Council of the Borough of Paramus for permission to carry on its business operations on Sunday, however, the application was rejected by the council on the ground that the business of plaintiff constitutes a retail sales activity, irrespective of whether a movie tape is being sold or rented, and thus, was prohibited by the terms of the Sunday closing law.

Protesting the action of defendant, Paramus, plaintiff-RKO advances a three-prong attack:
(1) that the business activity carried on by RKO is a form of recreation or amusement;

(2) its business operations are indistinguishable from the activity conducted at local movie theaters which are exempted from the ban of the ordinance; and

(3) that in order to remove any doubt of its qualifications for exemption, RKO is willing to refrain from selling movie tapes on Sunday and will engage only in the business of renting movie tapes on that day.

The issue, thus, squarely presented for determination, here, is whether the business activity of RKO is a form of recreation or amusement with respect to the sale and rental of video cassette movie tapes, or in the alternative only the rental of the same.

Steven Burns, president of RKO testified at trial that movies, in cassette tape form, are the product of his company and have grown substantially over the last 20 years. Today, home video movie tape sales and rentals have a nationwide ten billion dollar market. Moviemakers produce and provide films for both types of users. Home video cassette tape marketers such as RKO usually have a 60– to 90–day window over cable or regular TV programming.

The method of distribution of full length movies is generally as follows:

(1) initially in movie theaters;

(2) after an approximate three-month time span, a movie appears on a video cassette tape; and

(3) approximately 60 to 90 days thereafter, movies are then available for cable or regular TV showing.

Burns asserts that his products are sold or rented for use as recreation or entertainment and are identical to those shown in movie theaters and the rental of a video cassette movie tape costs less than theater tickets and is an activity in which the entire family can participate without extra expense. Burns stated that 1979 is widely recognized as the first year of the video cassette tape movie business. The RKO store in the Paramus tenplex is open every day except Sunday, whereas the movie theaters in Paramus are open every day including Sunday. The sales volume of video tapes accounts for only 5% of the business of RKO while rentals account for 95% of its revenue. Burns characterized the renting or selling of video

cassette movie tapes as an "impulse" activity, in that the end users, whether they be purchasers or rentees decide at the very last minute whether to purchase or rent a particular video cassette movie tape.

Paramus Police Chief Joseph Delaney testified that he was the designated borough official charged with the responsibility to enforce the ordinance. Chief Delaney stated that he closed the RKO stores on Sunday at the direction of the mayor of Paramus, but that if it was left to him to decide, he would permit the sales or rentals of video cassette movie tapes on Sunday because, in his judgment, the activity constituted a form of recreation.

The words "recreation" or "amusement" must be interpreted in accordance with the intent of the framers of the ordinance. The words themselves are not capable of definition with preciseness or with mathematical certainty, and there is no need for such exactitude. In order to properly fit the legislative mold, it is necessary that the term "recreation" or "amusement" be given a degree of elasticity without disturbing the basic or common understanding of the meaning of the words themselves. It is in that context that a common sense determination can be made as to whether a particular business activity is exempted from or transgresses the ban of the ordinance.

There are marked distinctions between permitted activity and those which are prohibited. Of great importance is that which occurs at the cash register at the time of the transaction.

There are those activities, such as concerts, stage plays, movies, baseball or football games, *etc.*, which simply require the public to purchase a ticket of admission if a charge is being made for the event and other forms of permissible recreation or amusement in which the public may engage, such as bike riding, jogging or running, for which no charge is made. On the other hand, in the case of a prohibited activity which may have some ultimate recreational or amusement feature, what takes place at the cash register is a retail sale or rental

transaction which the ordinance is specifically designed to forbid.

The act of selling or renting a video movie cassette tape is a retail transaction involving the sale or distribution of a product; the participants in that particular transaction do not know, nor do they care, whether the recreational or amusement feature will be immediately realized; the act of selling or renting a video cassette movie tape is not a recognized form of recreation or amusement and the fact that ultimately recreation or amusement may be realized is purely fortuitous and incidental to the primary business transaction.

To accept plaintiff's reasoning would emasculate the ordinance and render it nugatory because it is well known that a large percentage, perhaps even a majority of those who participate in retail shopping as customers regard the activity as recreational, yet the ordinance under attack was specifically designed to prohibit retail sales and any component thereof except as may be specifically exempted.

RKO also points out that cable and regular television reception and repair is a permitted Sunday activity and that its business is hardly dissimilar, and therefore, should be exempted from the ban of the ordinance. I disagree.

The fact that cable or regular TV transmission and repairs are permitted on Sunday can be of no solace to RKO because residents of Paramus are permitted to carry on those activities, among many others, within the confines of their own residences on Sunday without violating the ordinance because the ordinance does not apply to residential TV or cable reception, while repair of a system is exempted on the ground of necessity.

Therefore, I find that the sale or rental of video cassette movie tapes is a retail business activity not otherwise permitted under the Paramus Sunday closing law and is prohibited.

Judgment on the first count of the complaint is hereby entered in favor of defendant, Paramus, and against plaintiff, RKO, of no cause for action.

Counsel for plaintiff-Mack will submit a form of judgment in conformity with this opinion pursuant to the five day rule, *R.* 4:42–1(b), in the case of *Mack v. Paramus.*

Counsel for plaintiff-Sterns will submit a form of judgment in conformity with this opinion pursuant to the five day rule, *R.* 4:42–1(b), in the case of *Sterns v. Paramus.*

Counsel for defendant-Paramus will submit a form of judgment in conformity with this opinion pursuant to the five day rule, *R.* 4:42–1(b) in the case of *RKO v. Paramus.*